Filed 9/17/20  P. v. Ruoff CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>JOSHUA RICHARD RUOFF,<br><br>        Defendant and Appellant. | A154980<br><br>(Mendocino County<br>Super. Ct. No. SCUKCRCR<br>16-858442) |

In June 2018, a jury convicted Joshua Ruoff of first degree murder with an enhancement for using a baseball bat to commit his crime.  (Pen. Code, §§ 187, 189, 12022, subd. (b)(1); statutory references are to this code.)  He was sentenced to 26 years to life in prison.  On appeal, Ruoff contends his conviction must be reduced to second degree murder because there is insufficient evidence that he acted with deliberation or, alternatively, because he was denied the effective assistance of counsel at trial.  We affirm the judgment.

## TRIAL EVIDENCE

### I.  The Prosecution Case

On or about the late evening of May 17, 2016, Timothy Sweeting was murdered at a 15-acre cannabis farm in Covelo.  At the time, Ruoff worked

and lived at the farm with several other people, including its owner, John Overend. Sweeting was an occasional worker who planned to lease part of the farm for his own operation. When Sweeting was in town, he slept on the living room couch.

## A. Ruoff's Strained Relationship with Sweeting

In May 2016, the house at the Covelo farm was crowded, which caused some friction. Ruoff, in particular, was annoyed by Sweeting. He thought Sweeting was lazy and did not like the fact that Sweeting slept on the couch while others were working. Also, several workers had dogs; as many as eight dogs stayed at the farm, and Sweeting's dog was in heat, which caused problems for the unneutered male dogs, including Ruoff's dog, Shyza.

During the week prior to Sweeting's murder, Ruoff frequently complained about Sweeting. For example, in a May 10 text message to his friend, Shelby, Ruoff said that Shyza was acting stupid because another guy's dog was in heat and the guy would not take her away until she was finished. Ruoff continued: "A[l]most just want to let shyza kill him and fuck his stupid fucking dog."

On May 14, Shelby sent a text to Ruoff asking about his day and Ruoff complained again about Sweeting and his dog. Ruoff said that the "dbag" had talked "shit" about Ruoff because Ruoff was "pissed" that the guy left his dog at the house while she was in heat. Ruoff told Shelby he was trying to convince Overend not to let Sweeting live at the house anymore.

## B. The Events of May 17, 2016

On May 17, Ruoff communicated with Overend by text messages while Overend spent the day in Ukiah and the night in Tahoe with his friend "Swoop." At 7:00 a.m., Ruoff complained to Overend that Sweeting had

2

overwatered the marijuana plants. Ruoff said he did not want to be around Sweeting, calling him a "fucking idiot."

A few hours later, Ruoff urged Overend to move forward with a plan for Sweeting to get a trailer so he and his dog could stay on a different part of the farm. Messages about this plan continued into the afternoon. Ruoff did not want to be the one to tell Sweeting to move because he did not want to take the blame for "cutting into [Sweeting's] couch lounging time."

On the afternoon of May 17, Ruoff's housemate Tyler Marschok went to the store. At Ruoff's request, Marschok bought a 12-pack of beer for Ruoff. By that evening, Ruoff had consumed most if not all of the beer. During the afternoon and early evening, Ruoff also spent a few hours working at another farm that was owned by Brock Rogers. Rogers worked as a consultant for Overend and was also a friend of Sweeting. Ruoff and Rogers drank beer together, but Rogers did not think that Ruoff was intoxicated.

At around 7:00 p.m., Rogers drove Ruoff back to Overend's farm. During the ride, Ruoff complained about Sweeting. He was "disgruntled" and "upset" about the living situation and the dogs. He felt that Sweeting was lazy and messy and did not do enough work.

Between 10:30 and 11:02 p.m., Ruoff sent Overend several text messages about Sweeting. Ruoff started by telling Overend that Shyza was not wearing his muzzle and opined that if it had been off earlier in the day the dog would have bitten Sweeting. Ruoff used derogatory terms to refer to Sweeting and his dog. He was upset that Sweeting had "talk[ed] shit" about him and accused him of being " 'agro' " when other dogs had gone missing earlier that month. Now Sweeting's dog was missing, and he claimed to be worried, but he had already gone to sleep.

3

At 10:55 p.m., Ruoff sent Overend the following text: "I'm gripping the bat that can solve this problem." When Overend read this message, he assumed Ruoff was just "venting, blowing off steam." Overend responded "let the babe sleep."

Overend stopped checking his phone for a while, but Ruoff continued to send him texts. Ruoff said, "Eternal sleep is the cure bird," using the nickname "bird" to refer to Overend. Next, Ruoff texted, "Fucking kid is leech" and continued, "If it doesn't happen tonight it's going to happen[.] I don't get down with 3\4 wigger 1/4 I've been to a festival whistle boy." Ruoff corrected "whistle boy" to read "White boy" before completing his thought by complaining that he had been through "some shit" since he had been at the farm.

At 11:01 p.m., Ruoff texted: "I'm about ready to show my craziness." At 11:02, Ruoff said, "I can out [*sic*] hold back so long." This was the last text that Ruoff sent to Overend on May 17 and he sent it along with a photograph of his baseball bat.

After Ruoff finished texting Overend, Ruoff went into the kitchen, carrying his baseball bat on his shoulder. Marschok was in the kitchen making a snack and Sweeting was asleep on the living room couch. Ruoff walked to the toaster and put the barrel of the bat down in the sink. He pulled out Marschok's English muffin and flipped it over, telling Marschok it would cook better that way. Marschok was confused by this encounter and thought Ruoff was making a weird joke. Ruoff was not being "normal," but he did not seem drunk.

Then, Ruoff walked over to the couch with the bat on his shoulder. He started talking about the dogs, complaining that Sweeting had not been concerned when Overend's dogs went missing earlier that month, but that

4

Sweeting was distraught about his own missing dog. As best Marschok could tell, Sweeting was not fully awake or participating in this conversation. Then Marschok heard a noise and Sweeting swear. When he turned around, Ruoff was attacking Sweeting with the bat. Sweeting did not have time to do anything but raise his arms to try to block the blows. Ruoff swung the bat over and down at least ten times, hitting Sweeting's head and upper body.

Marschok tried to stop the attack. But it seemed like each time Marschok yelled, Ruoff hit Sweeting again. He tried to grab Ruoff's arm, but Ruoff used one hand to push Marschok away and continued to swing with the other. Marschok was afraid Ruoff would turn on him, so he grabbed his dogs, got in his car and drove away. When Marschok left the house, Sweeting was alive. Marschok called Overend and told him about the fight, but he did not call the police until the next day.

## C. Ruoff's Activities After the Murder

A few minutes before 1:30 a.m. on the morning of May 18, Ruoff sent the following text to his friend Shelby: "If you could call out sick and show up here with a 24' U-Haul in the am I would owe you my life." Shelby responded at 4:44 a.m., sending this text: "As much as I want to do that for you, I can't do that today. Do you really wanna move out?" Ruoff replied, "Yes[,] no worries."

Meanwhile, Overend had been trying to contact Ruoff or Sweeting. Eventually, Ruoff accepted a call from Swoop. Ruoff said he was packing his stuff and going to New Hampshire. Overend called Ruoff back on Swoop's phone and asked about the fight. Ruoff said Sweeting was hurt "pretty bad" but was "all right" and had gone out to look for his dog. Overend was not planning to leave Tahoe until later that day, so he asked some friends to check on the house and also called the police.

5

At around 7:30 or 8:00 a.m., Ruoff called Brock Rogers who agreed to give him a ride to Willits. After Rogers talked to Ruoff, he received a call from Overend, who told him that Ruoff had a fight with Sweeting. When Rogers arrived at the house, he noticed that half the porch was wet, and the living room looked freshly cleaned and smelled of cleaning supplies. Ruoff did not seem to be under the influence of anything, but he was upset, "kind of all over the place."

Ruoff told Rogers that he "lost his shit" and got in a fight with Sweeting. When Rogers asked if Sweeting was hurt, Ruoff gave a vague response and said Sweeting was out looking for his dog. Ruoff loaded his belongings and dog into the car. Rogers assumed he was moving out because of the fight. During the drive to Willits, Ruoff called his father, said he was going to see his girlfriend in New Hampshire, and asked his dad to rent a U-Haul. Rogers dropped Ruoff off at the U-Haul store.

### D. The Investigation

On May 18, the Mendocino County Sheriff's Department received a report of an assault at the Overrend farm. When officers arrived at the farm at around 7:00 p.m., they were greeted by two men who said that Overend had asked them to check on the place. Inside the house, the officers found blood on the living room ceiling, carpet and couch. Officers searched the entire property. They found dogs but no people.

On the morning of May 19, Detective Espinoza went to the cannabis farm. Espinoza, the Sherriff Department's lead investigator, came to suspect that a body had been dragged out of the house. He found an empty bottle of bleach in the trash, which he suspected was used to clean the crime scene. There was a faint trail of blood from the couch to the front door, and spots or clumps of blood on the front porch, front steps and a patch of grass. And a

6

watch had been found in the yard. Sweeting's vehicle was located a half mile away from the house, parked on the side of the highway with Sweeting's dog inside.

Investigators from several agencies searched the property. On June 2, 2016, Sweeting's body was finally found, buried behind the house on Overend's farm. While "screening" layers of dirt above the body, the recovery team found a crumpled piece of paper that appeared to have burn marks on it. The paper was a receipt for items Ruoff purchased at the local grocery store on May 17.

An autopsy report indicated that Sweeting had several lacerations on the left side of his head and face. The index and middle fingers on his left hand were also injured. He had multiple skull fractures, and two deep lacerations on the front of his head, one extending from his right eyebrow to the left side of his scalp along his hair line, and the other on the left side of his forehead. He had a "very large incised wound" that extended from one side of his neck to the other. The wound consisted of multiple incisions caused by an instrument that cut through the skin and muscle of Sweeting's neck.

Sweeting's cause of death was blunt force head injuries. Because the neck injuries were probably inflicted post-mortem, they were not identified as a contributing cause of death.

## II. The Defense Case

### A. Ruoff's Testimony

Ruoff testified that he grew up in New Hampshire with an abusive father, started drinking alcohol when he was 13, and began taking illegal drugs when he was 15. Shortly before he turned 21, Ruoff was diagnosed as bipolar and prescribed medication for anxiety. He participated in therapy,

which helped him maintain sobriety, but had many relapses. He also has a history of self-harming and suicide attempts dating back to his teenage years.

Ruoff testified that he had his first "blackout" from drinking alcohol when he was 13 and subsequently experienced blackouts while drinking or taking drugs. His blackouts make it impossible for him to remember things that happened, sometimes for a period of hours and sometimes for half a day. Ruoff described several blackout experiences for the jury, recalling details surrounding the incidents and recounting what other people told him happened during periods he could not remember.

When Ruoff moved to California to work at Overend's farm in November 2015, he was abusing drugs and alcohol. In April 2016, he began trying to use Xanax instead of drugs or alcohol to control his anxiety. He weaned himself down to one or two beers a day and reduced his use of other drugs as well.

Ruoff testified that everybody living at the farm got along fine, including Ruoff and Sweeting. But in May 2016, Ruoff was frustrated with Sweeting, mostly because of their different approaches to caring for their dogs and the fact that Sweeting's female dog was in heat and causing problems for the unneutered male dogs. Then, on May 14, Sweeting went on a trip and left his dog in the house where she made a mess. Ruoff was annoyed about this incident but he "wasn't really that mad." Ruoff explained to the jury that he complained to friends about Sweeting because he was a complainer by nature.

On the morning of May 17, 2016, Ruoff sent Overend texts about Sweeting because he wanted to let the boss know what was going on. Ruoff supported the plan for Sweeting to get his own trailer and left it to Overend

to make that happen. Although Ruoff had become annoyed with Sweeting, he denied disliking the man.

Ruoff testified that when he went to work at Brock Rogers' farm on May 17, he drank a lot of beer. He also took cocaine with Rogers because he was very anxious, and his Xanax was not working. Ruoff was experiencing extreme stress because his father was about to have heart surgery. He was also very paranoid that the police might raid the farm. By the time Ruoff got back to the Overend farm, at around 7:30 p.m., the cocaine was wearing off. So he asked Marschok to buy him beer. While Marschok was at the store, Ruoff took two Xanax, using wine to wash them down. After Marschok returned from the store, Ruoff started "shotgunning the beers."

Ruoff testified that he recalled some things he did on the evening of May 17, while he was drinking beer. He walked around the house, saw Marschok outside with his dog, texted with an old girlfriend. He remembered rolling a cigarette and after that, his next memory was of sitting on the floor next to his dog and noticing blood on his hand. Then he saw the text messages he had sent to Overend, but he had no memory of composing them.

Ruoff remembered that he took his cigarettes and walked to the common area of the house, where he saw a trail of blood. He felt like he was in a bad dream and was still intoxicated. The front door was wide open, and Sweeting's body was in the yard. Ruoff sat on the deck, punched himself over and over and smoked cigarettes, which he put out in his hand. He was in shock, panicked and scared. He sent a text asking Shelby for help even though he did not know her well because he had nowhere else to turn. He had been advised to never call the police because of the work they did at the farm. And he was afraid of Overend and Overend's friends, who had "connections with a lot of scary people."

9

Ruoff tried to make a plan, deciding to tell people that Sweeting was out looking for his dog. He moved Sweeting's truck down the road and then moved the body to the back yard and buried it. As he dragged Sweeting's body, which was face down, it caught on a railroad tie, so he had to use "some resistance" to get Sweeting over it. Then Ruoff got a shovel and dug a grave, which he had experience doing because he used to work in a cemetery. As he dug, he made a plan to get a U-Haul and return to his family. He did not think he was getting away with anything, but he did not want to leave his dog on the farm where it would be in harm's way.

After Ruoff buried the body, he tried to "clean up a little bit" and then called Rogers and asked for a ride. Ruoff admitted that he cleaned up "to avoid detection." But he denied that he planned or intended to kill Sweeting. Nor did he remember harming Sweeting.

### B. Dr. Terrell's Testimony

Dr. Howard Terrell testified as a defense expert in the field of forensic psychiatry. He is one of four court-appointed psychiatrists who evaluated Ruoff in 2017 and concluded he was legally sane.

Terrell first interviewed Ruoff on August 28, 2017. Ruoff reported that he had consumed a lot of alcohol on May 17, 2016, but he could not recall if he took Xanax and he did not mention cocaine at all. Although Terrell found that Ruoff did not meet the legal criteria for insanity, he reported that Ruoff suffered from the following conditions: bipolar disorder, in full remission; panic disorder; and an unspecified anxiety disorder. Terrell could not rule out several drug and alcohol use disorders. He noted a reported history of blackouts but could not rule out "malingering coexistent with genuine mental illness."

In May 2018, Terrell re-evaluated Ruoff at the request of defense counsel. Before conducting a second interview, Terrell reviewed some medical records and spoke with Dr. Haines, a psychiatrist who previously treated Ruoff. Dr. Haines confirmed to Terrell that Ruoff has a history of alcohol and drug related blackouts. During his 2018 interview, Ruoff gave Terrell additional information about the incident, including that he took Xanax and cocaine and that he was experiencing extreme anxiety because of his father's pending heart surgery. He also reported that he had been upset about the dogs at the farm, and that he was paranoid that authorities might conduct a raid.

At trial, Terrell described the phenomena of alcohol induced blackouts. He testified that a blackout is "not the same as just passing out and going to sleep. . . . A person may be fully awake, walking, talking, talking nicely, arguing, fighting, running, jumping, driving a car, and be highly intoxicated at a high level of alcohol such that the brain's ability to record the memories of what they've done is basically turned off." According to Terrell, it is very difficult to ascertain what a person was thinking or why a person did something during a blackout. The impediment to assessing cognition is not just that the person has no memory of the experience, but also the "exceptionally high level of alcohol that is normally required to bring about a blackout."

Terrell testified that this type of blackout usually requires a quantifiable amount of alcohol consumption. A person who consumes alcohol without also taking drugs would have to consume twice the legal limit for driving drunk in California before triggering a blackout experience. Based on the defense evidence, Terrell calculated that Ruoff had attained a sufficiently high level of intoxication to have been experiencing a blackout when he killed

11

Sweeting. Terrell opined that combining Xanax, which can cause amnesia, increased the likelihood that Ruoff blacked out. And, "[a]dding cocaine would make a bad situation worse."

Terrell also offered the opinion that when a chronic alcoholic like Ruoff experiences a blackout, he may or may not display "physical symptoms," but will likely have "mental effects," such as poor judgment and impulse control, and that the person's "ability to think rationally would be greatly, greatly impaired." In response to a question whether the person would have the "ability to rationally consider consequences," Terrell testified "[m]ost likely not, certainly not at that very high level." When asked if such a person would "have the ability to consider their actions," Terrell responded: "They would be able to think about actions but albeit very, very impaired in their mental functioning from the intoxication on alcohol and any other abusable substances."

Under cross-examination, Terrell acknowledged that Ruoff could be malingering, and "[i]f people are malingering, you can't rely on the history they give you. It may be self-serving and dishonest." In this case, Ruoff's memory "definitely was more detailed" in 2018 than it had been in 2017. Terrell acknowledged that, generally, psychiatrists expect memory to get worse rather than better with time. He also confirmed that when a subject has lied in other contexts, we should be more skeptical about the credibility of that person as a historian.

## III. The People's Rebuttal Witness

Dr. Jessica Ferranti testified as the People's expert in forensic psychiatry. Like Terrell, Ferranti was appointed by the court to evaluate Ruoff and concluded he was legally sane.

12

When Ferranti interviewed Ruoff in September 2017, he was cooperative and engaged and did not exhibit any "acute psychiatric symptoms." He was "logical and linear and pertinent." He was prescribed medications that do not cause cognitive impairment or memory problems. Nor did he display any memory difficulties, aside from his "claim of having total memory loss for the period of time during which the murder occurred."

Ferranti testified that substance abuse blackouts cause amnesia or memory loss, and their affect can vary from loss of fragments of memory to a complete void during a period of time. For most people who experience these blackouts, there are two causal factors: high alcohol ingestion; and rapid consumption. ~RT 1571)~ Ferranti testified that it is important to distinguish between passing out and blacking out. People experiencing a blackout may be able to engage in complex behavior and social interaction. This is because their "cognitive functioning is relatively preserved," although they lose the ability to transition from short-term to long term memory. Thus, if a person killed someone while experiencing a blackout, there would still be a question whether he maintained sufficient cognitive functioning to think, plan and express an intention about what he was going to do.

Ferranti opined that when a person has experienced a blackout episode, observations by other people can help piece together information the subject cannot provide. Written documentation of what a person said or did may provide insight about whether the person was or was not cognitively impaired. Documentation of a person's state of mind during a period prior to an incident may also be helpful as a comparative tool. As Ferranti explained, "we're trying to get to what the mental state was at the time, as close as we can get to the incident offense as possible, the murder in this particular case. So if we had text messages or records that showed consistency or similar

13

sorts of language or mental state that was consistent with the mental state that was documented right before the murder, then that gives us a clue whether there was an altered mental state or whether that was a prolonged sustained, perhaps even a normal state of mind for this particular person."

The prosecutor asked Ferranti to review text messages that had been admitted into evidence in this case. She saw a "pattern" of Ruoff being annoyed with the victim "quite a bit prior to the time of the murder." Then, right before the murder, during the period Ruoff stated he had no memory, Ruoff made comments alluding to violence and murder and used "very aggravated, angry language" and "a lot of expletives" when talking about the victim. Ferranti believed that the statement, "I'm about ready to show my craziness" was antithetical to "impulsive violence"; it showed "that there was thinking about something, anticipation of something that was about to happen without actually acting on it at that particular moment in time." Also, the correction of a typo in one message demonstrated that the author was maintaining sufficient attention to communicate intentional thoughts.

Ferranti also offered the opinion that Ruoff used the same tone and tenor and expressed the same aggravation with Sweeting in text messages he wrote several days before the incident, at a time when he was not alleging that he was intoxicated or having a blackout. These similarities, which even included parallel statements about killing the victim, are an indication that cognitive functioning was consistently maintained. Ferranti clarified though that it would not be possible to determine from the text messages alone whether there was any cognitive impairment.

Under cross-examination, Ferranti acknowledged that several statements from texts that Ruoff made during the week prior to May 17 were much more reasonable than statements he made on the night of the murder.

14

She disputed however that Ruoff's concern about a potential raid at the farm was evidence of paranoia, testifying that it was an "entirely rational idea" under the circumstances. Similarly, Ferranti opined that Ruoff had good reason to worry that his dog could be shot if there was a raid in light of evidence that all the other dogs at the farm were not pets but pit bulls that were used for security.

On re-direct, the prosecutor reviewed the text message evidence again. Counsel asked Ferranti to compare the May 10 statement, "A[l]most just want to let shyza kill him and fuck his stupid fucking dog," with the May 17 statement, "Fuck his dogs and fuck him." Ferranti agreed that these statements appear to reflect the same or a very similar thought process. Ferranti responded: "Yes. These two text messages in particular, the 'I'm gripping the bat that can solve this problem,' and the next one, 'Eternal sleep is the cure,' links these ideas about homicide with his reactive anger about the issues that were going on between them." Following up, the prosecutor pointed out that the second statement was a response to Overend's message to let the babe sleep and asked whether it appeared that Ruoff was "actively processing, thinking and considering carefully the options and choices that are being made." Ferranti responded, "Yes, it appears so."

## DISCUSSION

### I. Ruoff's Conviction Is Supported by Substantial Evidence

Ruoff concedes on appeal that the jury could have convicted him of second degree murder. He contends, however, that the prosecution failed to prove the additional elements required to convict him of first degree murder. We review this sufficiency of the evidence claim under the familiar substantial evidence standard, which requires us to consider the entire record in the light most favorable to the judgment. (*People v. Clark* (2011) 52

15

Cal.4th 856, 942.) " 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*Id*. at p. 943.) "We ' " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " ' " (*Ibid*.)

Our review is framed by these principles: Murder is "the unlawful killing of a human being . . . with malice aforethought." (Pen. Code, § 187.) " 'Express malice is an intent to kill. . . . Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses.' [Citation.] A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder. [Citation.] 'Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 941–942.)

We conclude that the jury's first degree murder verdict is supported by substantial evidence. First, the evidence that Ruoff committed homicide is overwhelming and undisputed. Second, Ruoff concedes on appeal that the trial evidence supports a finding of premeditation. Finally, there is also substantial evidence that Ruoff acted willfully and deliberately, as well as with premeditation. On May 10, 2016, a full week before the murder, Ruoff contemplated letting his dog kill Sweeting. A few days later, Sweeting let his dog mess up the house and Ruoff began lobbying to get Sweeting kicked out of the house. When Sweeting was still there on May 17, Ruoff was angry and frustrated. His texts and oral statements to friends, Marschok's testimony,

16

and the autopsy results are strong evidence of Ruoff's intent to kill, formed willfully, deliberately, and with premeditation.

Ruoff's arguments focus on evidence supporting the element of deliberation. "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection." ' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) In his appellate briefs, Ruoff parses the trial evidence in an effort to demonstrate that none of it shows that he carefully weighed or considered a plan to kill Sweeting. We are not persuaded by these arguments.

Ruoff begins by suggesting that he was convicted of first degree murder because the jury overreacted to the brutality of Sweeting's death. "It is well established that the brutality of a killing cannot in itself support a finding that the killer acted with premeditation and deliberation. 'If the evidence showed no more than the infliction of multiple acts of violence on the victim, it would not be sufficient to show that the killing was the result of careful thought and weighing of considerations.' " (*People v. Anderson* (1968) 70 Cal.2d 15, 24–25.) Here, the finding that Ruoff killed with malice aforethought was not based solely on the violent nature of his crime but was supported by other substantial evidence, including Ruoff's own statements, which showed that Ruoff developed a plan to get rid of Sweeting by killing him with a baseball bat and that he executed that exact plan.

Furthermore, to the extent Ruoff is suggesting that the brutality of his crime was wholly irrelevant, he misunderstands the law. The elements of

17

"premeditation and deliberation may be shown by circumstantial evidence" when "the proof is such as will furnish a reasonable foundation for an inference of premeditation and deliberation." (*People v. Anderson*, *supra*, 70 Cal.2d at p. 25, italics omitted.) Generally, three categories of circumstantial evidence are used to support such an inference: a pre-existing relationship between the defendant and victim that suggests a motive for the killing; planning activity by the defendant prior to the crime, which was directed toward or intended to result in a killing; and the nature of the killing, when it indicates the defendant killed the victim according to a preconceived plan. (*Id.* at p. 27.) All three categories of evidence were before the jury in this case. Ruoff was angry and frustrated because he did not want to be around Sweeting and Sweeting's dog (motive); he voiced the idea of killing Sweeting as early as May 10 and shared details of his plan with Overend on the evening of May 17 (planning); and he beat Sweeting to death with a baseball bat, which was his preconceived plan (nature of the killing).

Ruoff concedes that text messages he sent to Overend on the evening of May 17 and his encounter with Marschok in the kitchen are evidence that he decided in advance to kill, but he argues that this shows nothing more than premeditation; it is not the careful weighing and consideration that is required to prove deliberation.

We reject the implication that the same evidence cannot be used to, or does not suffice to, establish premeditation and deliberation. These elements have distinct meanings, but they are part of the same "process" that distinguishes first from second degree murder. (*People v. Mayfield* (1997) 14 Cal.4th 668, 767; see also *People v. Stitely* (2005) 35 Cal.4th 514, 543 ["An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash

18

impulse"].) Here, there is substantial evidence that Ruoff engaged in that process. During the hour before he attacked Sweeting, Ruoff expressly contemplated what he would do and how he would do it. He told Overend why he thought his plan was justified and even took the time to correct a typo in one text message. Then he rejected Overend's advice to let Sweeting sleep and made a choice to commit murder.

Moreover, Ruoff ignores evidence of his state of mind during the month of May 2016, which shows that Ruoff became increasingly angry because he did not want to be around Sweeting or Sweeting's dog, but he could not convince Overend to kick Sweeting out of the house. The jury could have concluded reasonably that Ruoff hated Sweeting and wanted to get rid of him. Ruoff denied having these feelings but the jury was not required to credit Ruoff's testimony.

Ruoff argues that he was incapable of deliberation because Marschok's testimony proves that Ruoff's state of mind was "abnormal" when he attacked Sweeting. Marschok's testimony was not dispositive; the fact that Ruoff was behaving strangely is not inconsistent with a finding of express malice or deliberation. The record also shows that Ruoff considered killing Sweeting as early as May 10, and that he shared the details of his plan on May 17, during the hour before he killed Sweeting with his baseball bat. Considered in its totality, this evidence substantially supports the finding that Ruoff acted with deliberation.

Ruoff contends that a defendant's "displeasure" with another person cannot support a rational inference that the defendant weighed or carefully considered killing the other person, even if that is ultimately what happened. In other contexts, this may be true. For example, Ruoff cites *People v. Bender* (1945) 27 Cal.2d 164, where the defendant was convicted of the first degree

19

murder of his wife despite denying that he was her killer. Reducing the defendant's conviction to second degree murder, our Supreme Court held that (1) the jury was not required to believe the defendant's testimony; (2) a finding of implied malice was supported by evidence that the defendant and his wife had a violent argument about infidelity; but (3) there was "no substantial evidence from which it reasonably [could] be inferred that defendant either formed or carried out the intent to kill deliberately, and with premeditation." (*Id.* at p. 186.) Step (3) of the *Bender* court's holding illustrates why this case is different. Unlike the *Bender* defendant, Ruoff expressed his hatred for the victim to several witnesses during the days leading up to the murder. Then he told his friend that he was going to kill the victim with a baseball bat in the hour before he executed that exact plan. These express admissions were direct evidence of premeditation and deliberation.

Taking a different tack, Ruoff contends that his defense expert's uncontradicted testimony compels a finding that Ruoff was incapable of deliberation because he was experiencing a blackout. This argument is factually and legally erroneous. First, Dr. Terrell offered the opinion that an alcohol induced blackout could severely impair a person's ability to rationally consider the consequences of their actions, but he did not testify that such deliberation was impossible. Second, Terrell did not testify that Ruoff actually experienced a blackout. He testified that if Ruoff's amended report about his alcohol and drug consumption was true, then Ruoff could have experienced a blackout. Of course, the jury was not required accept the factual predicates of Terrell's expert opinion. Indeed, Terrell acknowledged that Ruoff had changed his story and could have been malingering.

20

Ruoff contends that Terrell's testimony proves that Ruoff did not deliberate because Terrell's opinions were "neither contradicted nor reasonably subject to impeachment." As support for this claim, he cites an inapposite civil law rule providing that an inference or presumption may be rebutted by uncontroverted facts. (*Hicks v. Reis* (1943) 21 Cal.2d 654, 659; *Krause v. Apodaca* (1960) 186 Cal.App.2d 413, 419–420.) Terrell's expert opinions were premised on disputed facts. The jury was not required to accept those facts or the opinions they purportedly support.

Finally, Ruoff contends that the deliberation finding cannot be affirmed because the jury relied on Dr. Ferranti's invalid expert opinion. According to this theory, Ferranti essentially told the jury that Ruoff had the mental state required to commit first degree murder when she testified under redirect that the May 17 text messages appear to have been written by an individual who was considering his options and reflecting about what to do. Ruoff contends that this testimony was not substantial evidence of deliberation because Ferranti's opinion was conclusory and unsupported by reasoned explanation. This argument misses the mark. The evidence that is relevant to our review of the specific finding that Ruoff killed with deliberation is the text messages themselves, not the experts' collateral opinions about how to assess the cognitive functioning of an inebriated individual.

Ruoff's text messages are direct evidence of his state of mind; they show that Ruoff talked about killing Sweeting on May 10 and that he described a specific method of killing Sweeting on May 17. These statements and other evidence about Ruoff's actions during the relevant timeframe amply support the jury's finding that Ruoff intentionally killed Sweeting with premeditation and deliberation.

21

## II.  Ruoff Fails To Prove Ineffective Assistance of Counsel

Ruoff contends he was denied the effective assistance of counsel because his trial counsel did not attempt to preclude the prosecution from eliciting inadmissible testimony from Dr. Ferranti that prejudicially damaged his defense.

"It is defendant's burden to demonstrate the inadequacy of trial counsel." (*People v. Lucas* (1995) 12 Cal.4th 415, 436.)  To carry this burden, " ' "a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citations.]  Second, [the defendant] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.]  Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' " (*Ibid*.)

Here, Ruoff claims his trial counsel's representation was deficient for two independent reasons:  first, counsel failed to move for an acquittal at the close of the prosecution case; and second, counsel did not object when the prosecutor asked Dr. Ferranti whether the November 17 text messages were evidence of deliberation.  We separately address these flawed arguments.

### A.  Failure to Move for Acquittal

Section 1118.1 establishes a procedure whereby the defendant in a criminal trial may move for an acquittal "when the prosecution fails to prove a prima facie case." (*People v. Belton* (1979) 23 Cal.3d 516, 521.)  The motion, which may be made at the end of the People's case, authorizes "entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a

22

conviction of such offense or offenses on appeal." (§ 1118.1.) The essential purpose of section 1118.1 is to "promptly terminate a fatally deficient prosecution." (*People v. Riley* (2010) 185 Cal.App.4th 754, 766.)

In the present case, Ruoff's trial counsel could have concluded reasonably that a motion for acquittal would have been futile because the prosecutor did prove a prima facie case of first degree murder. "Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile." (*People v. Price* (1991) 1 Cal.4th 324, 387.)

Ruoff suggests two reasons his counsel should have filed an acquittal motion regardless of its merit. First, if the defendant does not bring this motion at the close of the prosecution case, he forfeits the claim that "the evidence was at that point inadequate." (*People v. Smith* (1998) 64 Cal.App.4th 1458, 1468.) Second, this type of motion requires virtually no effort as it can be made orally and need not be supported by a statement of specific grounds. (See *People v. Belton*, *supra*, 23 Cal.3d at pp. 521–522.) If these factors were overriding, an acquittal motion would be required at every criminal trial, which is not the law. There is nothing objectively unreasonable about forfeiting a meritless claim. Furthermore, the reason an acquittal motion need not be supported by a statement of specific grounds is not to encourage meritless motions but to avoid placing the defendant in the position of having to expose defects in the People's case, which could potentially then be cured. (*Id.* at p. 522.)

By parity of reasoning, Ruoff cannot carry his burden of proving that the failure to bring an acquittal motion caused him prejudice. " 'The test applied by the trial court in ruling on a motion for acquittal is the same test applied by the appellate court in reviewing a conviction for sufficiency of the

evidence, namely, to determine whether from the evidence then in the record, including reasonable inferences to be drawn therefrom, there is substantial evidence of the existence of every element of the offense charged.' " (*People v. Jones* (2013) 57 Cal.4th 899, 964.) Since the prosecutor presented a prima facie case of first degree murder during the People's case-in-chief, it is not reasonably likely that the outcome of this proceeding would have been different if defense counsel had moved for an acquittal.

## B. Failure to Make An Objection Under Section 29

Ruoff's second theory is that his trial counsel fell short by failing to object to an allegedly improper question that the prosecutor asked during his redirect examination of Dr. Ferranti. According to this theory, the prosecutor committed misconduct by asking Ferranti whether the May 17 text messages were drafted by an individual who "appear[ed]" to be "actively processing, thinking and considering carefully" his "options and choices." Ruoff contends a competent attorney would have objected to this question because it elicited an inadmissible opinion from Ferranti that Ruoff had the mental state to commit first degree murder.

Expert evidence regarding a criminal defendant's mental disease, disorder or defect is admissible "on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." (§ 28.) However, an expert who testifies about the defendant's mental condition during the guilt phase of a criminal trial may "not testify as to whether the defendant had or did not have the required mental states. . . . The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact." (§ 29.) In other words, as our Supreme Court has explained, section 29 " 'prohibits expert witnesses

from directly stating their conclusions regarding whether a defendant possessed a required mental state.' " (*People v. Pearson* (2013) 56 Cal.4th 393, 443.)

In this case, the prosecutor asked Ferranti if she agreed that the May 17 text messages were evidence of cognitive thinking; that they showed the author was actively considering his options. He did not ask the doctor whether Ruoff actually intended to kill Sweeting with deliberation. Moreover Ferranti did not violate section 29 by agreeing with the prosecutor's interpretation of the text messages. Section 29 does not prevent an expert from testifying about how the defendant's mental condition may or may not have affected him at the time of the offense, " 'as long as the expert does not cross the line and state an opinion that the defendant did or did not have the intent, or malice aforethought, or any other legal mental state required for conviction of the specific intent crime with which he is charged.' " (*People v. Herrera* (2016) 247 Cal.App.4th 467, 476.)

Ruoff cites authority holding that the restrictions of section 29 may not be evaded by "couching an opinion in words which are or would be taken as synonyms for the mental states involved." (*People v. Nunn* (1996) 50 Cal.App.4th 1357, 1364 [defense expert precluded from testifying that defendant impulsively fired his weapon].) That did not happen here; the prosecutor asked Ferranti if the text messages themselves were evidence of cognition and contemplation, not whether Ruoff killed Sweeting with malice aforethought. To be sure, Dr. Ferranti's interpretation of the text messages supported an inference that Ruoff had the mental state required for the charged murder. But this is " 'exactly the type of testimony sections 28, 29, and the case law, permit.' " (*People v. Herrera, supra*, 247 Cal.App.4th at p. 477.)

25

Even if a section 29 objection would have been appropriate, we reject Ruoff's appellate argument that there was no conceivable tactical reason for deciding not to object. Ruoff's defense at trial was that, if he killed Sweeting, he was unconscious of what he was doing because of his blackout or at least so cognitively impaired that he was incapable of acting with mens rea. Ferranti aided in this defense by conceding on cross-examination that the text messages Ruoff sent on the evening of the murder were less rational than messages he sent earlier that day. When the prosecutor went over the text messages again during redirect, defense counsel could have concluded reasonably that an objection would call additional attention to this unfavorable evidence.

Finally, Ruoff's theory of prejudice is seriously flawed. He posits that he would not have been convicted of first degree murder if his attorney had objected to Ferranti's redirect testimony because such an objection would have required the trial court to exclude the only evidence that the jury could have used to find that the deliberation requirement for first degree murder had been proven. First, we are not persuaded an objection under section 29 would or should have been sustained. Second, this particular testimony was not crucial to the judgment. As we have already explained, the prosecutor presented substantial evidence of deliberation and the other elements of first degree murder during the People's case-in-chief, and even without the challenged expert testimony the jurors would have been able to analyze Ruoff's texts for themselves. We do not think there is any reasonable probability that omitting this portion of Ferranti's testimony would have resulted in a verdict more favorable to Ruoff.

## DISPOSITION

The judgment is affirmed.

_____
TUCHER, J.

WE CONCUR:


_____
STREETER, Acting P. J.


_____
BROWN, J.


*People v. Ruoff* (A154980)

27